IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RACHEL WINSETT                      :

                                    :

    v.                              :   Civil Action No. DKC 21-2932

                                    :

H&S RESOURCES CORPORATION d/b/a
AKATA GLOBAL                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case are: (1) a motion for summary judgment filed by Defendant H&S Resources Corporation d/b/a Akata Global ("Akata") (ECF No. 57), and (2) a motion for leave to file surreply filed by Plaintiff Rachel Winsett ("Mrs. Winsett") (ECF No. 62). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part, and the motion for leave to file surreply will be denied.

I.   **Background[1]**

    A. **Factual Background**

Akata is a company that provides construction, fuel management, and logistics services for contracts held with

---

[1] Unless otherwise noted, the following facts are undisputed and construed in the light most favorable to the nonmoving party.

government agencies.  Akata has a government service contract with the United States Naval Research Laboratory, Chesapeake Bay Detachment ("NRL Chesapeake"), in Chesapeake Beach, Maryland.  The NRL Chesapeake contract is managed by a Project Manager.  The terms of the NRL Chesapeake contract require that four employees report to the Project Manager: (1) one General Maintenance Worker; (2) two Grounds Maintenance Workers; and (3) one General Clerk or Assistant.

In September 2016, Mrs. Winsett began working for Akata as a General Clerk I stationed at NRL Chesapeake.  Before her employment with Akata, Mrs. Winsett had no management experience.  (ECF No. 57-5, at 142-43).[2]  As a General Clerk I, Mrs. Winsett's duties were to:

- Answer and transfer telephone calls or take messages.
- Sort and deliver incoming mail and send outgoing mail.
- Schedule appointments and receive customers or visitors.
- Provide general information to staff, clients, or the public.
- Type, format, or edit routine memos or other reports.
- Copy, file, and update paper and electronic documents.
- Prepare and process bills and other office documents.
- Collect information and perform data entry.

_____

[2] Pin cites to documents filed on the court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

- Any/all (related) duties as assigned.

(ECF No. 57-5, at 127).   At the time, Mrs. Winsett's immediate supervisor was Glenn Ratliff ("Mr. Ratliff"), the Project Manager.

On November 1, 2018, Mrs. Winsett was promoted from General Clerk I to General Clerk II.   The promotion came shortly after Mrs. Winsett complained to Akata's Chief People Officer, Dr. Keith McMorris ("Dr. McMorris"), that Mr. Ratliff did not support her advancement at Akata.   Akata does not dispute Mrs. Winsett's assertion that Mr. Ratliff verbally asked her to be the point of contact between Akata and the Naval Academy, although Akata never formally assigned her that role.   (ECF Nos. 57-1, at 7; 58-2, at 11-12).

On January 24, 2020, Akata began investigating Mr. Ratliff based on allegations that Mr. Ratliff engaged in racially insensitive behavior toward Reggie Barnes ("Mr. Barnes"), an African American employee.   (ECF No. 57-4, at 29-30).   On January 27, 2020, Mr. Ratliff was placed on administrative leave pending the conclusion of Akata's investigation.   (*Id.* at 31).   On January 29, 2020, as part of the investigation, Mrs. Winsett provided an employee statement to Akata detailing her interactions with Mr. Ratliff in which she made several complaints of sexual harassment by Mr. Ratliff from November 2018 to January 2020.   (ECF No. 58-3, at 38-41).   Akata maintains it was unaware of any allegations

3

of sexual misconduct until Mrs. Winsett's January 29, 2020 statement. (ECF Nos. 57-1, at 8-9; 57-4, at 29-30).

During Mr. Ratliff's administrative leave, Akata assigned his Project Manager duties to Devin Scott ("Mr. Scott"), Akata's Chief Operating Officer. (ECF Nos. 57-1, at 9; 57-4, at 31). Mrs. Winsett and other employees assisted Mr. Scott in completing the Project Manager duties. (ECF Nos. 57-1, at 9; 57-6, at 11-12). At some point, Akata assigned Ronnie Tyrell ("Mr. Tyrell") to be on site at NRL Chesapeake and tasked him with handling several Project Manager duties with the possibility for him to fill the Project Manager position fully. (ECF Nos. 57-1, at 9-10; 57-4, at 31-32). At the conclusion of the investigation, Dr. McMorris prepared a summary of findings, which did not mention Mrs. Winsett's complaints of sexual harassment. Mr. Ratliff was terminated in February 2020. (ECF No. 57-4, at 33).

Following Mr. Ratliff's termination, Akata solicited applications to fill the Project Manager vacancy. The process for considering applications and ultimately filling the position is not well presented by the parties. The record only contains fragments of testimony by Dr. McMorris, Mr. Scott and Mrs. Winsett, and lacks many of the documents, such as the position announcement, all of the candidate applications, or offer letter. The testimony does not disclose who made the decision by Akata, whether any further approvals were necessary, whether the position

announcement indicated that the position could be filled prior to the end of the application period, or whether the decision maker was aware that Mrs. Winsett planned to apply or was interested in the position.

Mrs. Winsett claims that she was told she had until the close of business on February 28, 2020, to submit her application. (ECF No. 58-2, at 28).[3] Akata apparently agrees that, technically, the application window was open until the close of business that day, but then asserts that it made a verbal offer to another candidate the day before and a formal offer less than an hour before Mrs. Winsett submitted her application. (ECF No. 57-6, at 24).

Mrs. Winsett submitted her application on February 28, 2020, at approximately 10:50 a.m. (ECF No. 58-3, at 50). Nathan Duran ("Mr. Duran"), an Akata employee stationed at the Washington Navy Yards ("Navy Yards") facility, also applied for the Project Manager position. (ECF No. 57-1, 11-12). Akata offered the position to Mr. Duran around 10:00 a.m. on February 28, 2020. (ECF No. 57-4, at 47).

---

[3] The position was posted near the middle of the month. Mrs. Winsett says she did not apply immediately because Dr. McMorris said she would not be considered. (ECF No. 58-2, at 26-27). She had another conversation with Mr. Scott on February 24, 2020, and he said that she would be considered for the position. (*Id.* at 27-28). She submitted her application four days later. (ECF No. 58-3, at 50).

Mr. Duran was ultimately terminated in August 2020. After Mr. Duran was terminated, Mrs. Winsett again applied for the Project Manager position. Mrs. Winsett was interviewed but another applicant was ultimately hired for the position.[4] Mrs. Winsett resigned from Akata in October 2020.

**B. Procedural Background**

On May 6, 2020, Mrs. Winsett filed a Charge of Sex Discrimination and Retaliation with the United States Equal Employment Opportunity Commission ("EEOC"). (ECF Nos. 1, ¶ 5; 57-1, at 4 n.2). The EEOC sent Mrs. Winsett a notice of the right to sue on August 18, 2021, and, on November 11, 2021, Mrs. Winsett filed a complaint against Akata asserting claims under Title VII of the Civil Rights Act of 1991, 42 U.S.C. § 2000(e), *et seq.*, ("Title VII"), and the Maryland Fair Employment Practices Act, Md. Code Ann., State Gov't 20-601, *et seq.*, ("MFEPA"). (ECF No. 1). Akata filed a partial motion to dismiss on February 18, 2022. (ECF No. 25). Mrs. Winsett filed a response in opposition on April 13, 2022 (ECF No. 27), and Akata filed a reply on March 18, 2022 (ECF No. 28). Mrs. Winsett filed a motion for leave to file surreply on April 27, 2022 (ECF No. 31).

On September 6, 2022, Judge Hazel issued a memorandum opinion and order denying Akata's motion to dismiss in part, finding it

---

[4] Mrs. Winsett does not claim that her non-selection for this promotion was discriminatory. (ECF No. 57-5, at 80).

moot in part, and denying Mrs. Winsett's motion for leave to file surreply as moot. (ECF Nos. 35; 36). On February 25, 2023, this case was reassigned.

On April 1, 2024, Akata filed a motion for summary judgment (ECF No. 57), and on April 15, 2024, Mrs. Winsett filed a response in opposition (ECF No. 58). Akata filed a reply to Mrs. Winsett's motion on May 22, 2024, (ECF No. 61), and Mrs. Winsett filed a motion for leave to file surreply on May 14, 2024 (ECF No. 62), which Akata opposes, (ECF No. 63). Mrs. Winsett filed a reply. (ECF No. 64.)

## II. Standard of Review

A court will grant a motion for summary judgment when there is no genuine dispute of a material fact, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden to demonstrate the absence of a genuine dispute of material fact. *Med. Mut. Ins. Co. of N.C. v. Gnik*, 93 F.4th 192, 200 (4th Cir. 2024)(citing *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003)). If it meets this burden, the burden then shifts to the non-movant to show specific facts demonstrating a genuine issue for trial. *Id*. A court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the

motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Mrs. Winsett and Akata attached portions of depositions, declarations, and exhibits to their papers. Not all of the exhibits are accompanied by an authenticating declaration or affidavit. The exhibits may be considered, however, because "facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form." *Nordman v. Tadjer-Cohen-Edelson Assocs., Inc.*, No. 21-cv-1818-DKC, 2024 WL 895122, at *8 (D.Md. Mar. 1, 2024) (quoting *Wake v. Nat'l R.R. Passenger, Corp.*, No. 12-cv-1510-PWG, 2013 WL 5423978, at *1 (D.Md. Sept. 26, 2013)), *reconsideration denied*, No. 21-cv-1818-DKC, 2024 WL 1513522 (D.Md. Apr. 8, 2024).

Neither party contends that the other would be unable to provide admissible versions of their documents and emails at trial. The authors of the various email and text message communications would be able to authenticate the documents by testifying as to their personal knowledge of writing the communications.

Fed.R.Evid. 901(b)(1).   Similarly, a custodian of record could authenticate the employment contracts.   Fed.R.Evid. 803(6).

Akata does contest the usefulness, if not the admissibility, of some of Mrs. Winsett's own deposition testimony and witness declarations in its reply.   Mrs. Winsett requests leave to file a surreply to respond to those arguments.   Unless otherwise ordered by the court, surreply memoranda are not permitted to be filed. Local Rule 105.2(a).   "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."   *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citing *Lewis v. Rumsfeld*, 154 F.Supp.2d 56, 61 (D.D.C. 2001)).

Mrs. Winsett seeks to challenge the specific language Akata used to describe Mrs. Winsett's deposition testimony and the affidavits and declarations of several non-parties.   Akata both challenged and rebutted Mrs. Winsett's testimony and that of the non-party witnesses in its initial motion.   (ECF No. 57-1, at 26) ("[Mrs.] Winsett's belief that she was completing [Mr.] Ratliff's job duties . . . is not enough to overcome summary judgment."); (ECF No. 57-1, at 22) ("[Mrs.] Winsett's own self-serving belief . . . cannot establish a prima facie case of discrimination or pretext on this or any of her remaining claims.").   Further, contrary to Mrs. Winsett's assertion, Akata's motion is largely based on its asserted rebuttal of and undermining the affidavits

and declarations of Mrs. Winsett's witnesses.  The motion for leave
to file surreply is denied.

## III. Analysis

Mrs. Winsett asserts the following claims against Akata under
Title VII and MFEPA: (1) failure to promote (non-selection for
Project Manager in February 2020); (2) sex-based wage
discrimination (de facto Project Manager from May 6, 2018 on, but
paid as General Clerk); and (3) retaliation (protected activity in
July 2019 and January 2020, followed by wage discrimination as de
facto Project Manager and non-selection for Project Manager in
February 2020).  (ECF No. 1, 12-19).  Akata argues it is entitled
to summary judgment on all of Mrs. Winsett's claims.  Mrs. Winsett
disputes many of the factual assertions made by Akata and argues
that all the challenged claims depend on disputed material facts
and thus her claims are not appropriate for resolution on a motion
for summary judgment.  (ECF No. 58-2, at 1-6).

Title VII prohibits employers from "fail[ing] or refus[ing]
to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to [their]
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin."  42 U.S.C. § 2000e2(a).  The MFEPA "is the state
law analogue to Title VII."  *Jennings v. Frostburg State Univ.*,
679 F.Supp.3d 240, 276 (D.Md. 2023) (quoting *Alexander v. Marriott*

*Int'l, Inc.*, No. 09–02402–RWT, 2011 WL 1231029, at *6 (D.Md. Mar. 29, 2011)).

A plaintiff must provide evidence of intentional discrimination under Title VII through one of two avenues: "(1) direct or circumstantial evidence that discrimination motivated the employer's adverse employment decision; or (2) the *McDonnell Douglas* 'pretext framework' that requires a plaintiff to show that 'the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for [discrimination].'" *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973)). Direct evidence is "evidence of conduct or statements that reflect directly the alleged discriminatory attitude that bears directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995) (*abrogated on other grounds*). Mrs. Winsett does not offer direct evidence for any of her claims and must rely on the *McDonnell Douglas* framework.

The United States Court of Appeals for the Fourth Circuit has described the *McDonnell Douglas* framework in detail:

> Pursuant to this framework, a plaintiff first must make out a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v.*

11

> *Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089,
> 67 L.Ed.2d 207 (1981). The burden of
> production then shifts to the employer to
> articulate a legitimate, non-discriminatory
> justification for its allegedly
> discriminatory action. *Id.* at 253, 101 S.Ct.
> 1089. Finally, if the employer carries this
> burden, the plaintiff then has an opportunity
> to prove by a preponderance of the evidence
> that the neutral reasons offered by the
> employer "were not its true reasons, but were
> a pretext for discrimination." *Id.* The final
> pretext inquiry "merges with the ultimate
> burden of persuading the court that [the
> plaintiff] has been the victim of intentional
> discrimination," which at all times remains
> with the plaintiff. *Id.* at 256, 101 S.Ct.
> 1089.

*Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).

"Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination.'" *Wannamaker-Amos v. Purem Novi, Inc.*, No. 23-1568, 2025 WL 78324, at *5 (4th Cir. 2025) (quoting *Merritt*, 601 F.3d at 294). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). However, "courts should [not] treat discrimination differently from other ultimate questions of fact." *Merritt*, 601 F.3d at 295 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). Summary judgment

12

is still only appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Because "a claim under the MFEPA is also analyzed under the *McDonnell Douglas* burden-shifting framework, in line with claims under Title VII," the state law claims will be analyzed with their federal analogues. *Jennings*, 679 F.Supp.3d at 275.

## A. Counts I and IV: Sex/Gender Discrimination Failure to Promote

In Counts I and IV, Mrs. Winsett alleges that Akata violated Title VII, and the Maryland analogue, by denying her a promotion to the Project Manager position based on her sex. (ECF No. 1, ¶ 67-68). Mrs. Winsett does not argue that she has direct evidence of gender discrimination in her failure to promote claim. Rather, she relies on the *McDonnell Douglas* formulation.

Akata argues that: (1) Mrs. Winsett cannot make the prima facie showing necessary to support a failure to promote claim, and (2) even if Mrs. Winsett can make a prima facie showing, she has no evidence that Akata's legitimate non-discriminatory reasons for selecting another candidate were pretextual. (ECF No. 57-1, at 17-23).

### 1. Prima Facie Case

Under the *McDonnell Douglas* burden shifting approach, to establish a prima facie case for failure to promote, a plaintiff

13

must show that "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she qualified for that position, and (4) [the employer] rejected her application under circumstances that give rise to an inference of discrimination." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4ᵗʰ Cir. 2004) (citations omitted).    The first element is undisputed because Mrs. Winsett, a woman, is a member of a protected class.

### a. Application Requirement

Akata contends that Mrs. Winsett did not timely apply.    It has not met its initial burden to show an absence of dispute on this point: it recites that "four individuals applied for the project manager position by the date the application closed," including only one internal candidate, Mr. Duran.   (ECF Nos. 57-1, at 11; 57-3 ¶ 24).    But then Akata acknowledges that Mrs. Winsett applied on the final day of the posting.   (ECF Nos. 57-1, at 18; 57-4, at 45).    Both cannot be true.    Akata's own motion undermines its contention that Mrs. Winsett cannot show that she applied timely.

Mrs. Winsett submitted her application for the Project Manager position around 10:52 a.m. on February 28, 2020.   (ECF No. 58-3, at 50-51).    It is true that, by that time, Akata had offered the position to Mr. Duran.   (ECF No. 57-4, at 47).

14

Akata avers that it needed to fill the Project Manager position by Monday, March 2, 2020, to fulfill its obligations under the NRL Chesapeake contract. (ECF No. 57-1, at 13). Because the need to hire a Project Manager was urgent, Akata extended a verbal offer to Mr. Duran which was accepted on February 27, 2020. (ECF No. 57-4, at 51). A written offer was extended to Mr. Duran at around 10:00 a.m. on February 28, 2020. (ECF No. 57-4, at 47). Mrs. Winsett's application had not yet been submitted, although she presents evidence both that Akata knew that she intended to apply and that she had been told that she had until the end of the day to do so. (ECF Nos. 58-2, at 27-28; 58-3, at 49, 51).

It is unclear who ultimately extended the offer to Mr. Duran and whether that decision maker at Akata was aware Mrs. Winsett intended to apply for the Project Manager position. Dr. McMorris testified that Mr. Scott would have been the one to make the offer to Mr. Duran, while Mr. Scott testified that applications were reviewed by Dr. McMorris, not him. (ECF Nos. 57-4, at 51-52; 58-2, at 104-105).

Akata's argument that, while Mrs. Winsett's application was sent before the application window technically closed, it was not timely because Akata offered the position to Mr. Duran at 10:00 a.m., before Mrs. Winsett's application was submitted (ECF No. 57-

15

1, at 18-19), does not entitle Akata to summary judgment.[5]   The evidence is conflicting to some extent.  Mrs. Winsett avers that her delay in applying was because she was discouraged from applying by Dr. McMorris.  (ECF No. 58-2, at 27).  Mrs. Winsett states she only applied to the position after speaking with Mr. Scott who told her Akata would consider her application.  (*Id.* at 27-28).

Mrs. Winsett compares herself to the plaintiffs in *Lams v. General Waterworks Corp.*, 766 F.2d 386 (8ᵗʰ Cir. 1985), who were discouraged from applying for inter-departmental promotions. While that case did involve a somewhat analogous fact pattern, ultimately the direct evidence of discrimination in the effort to dissuade workers from applying for promotions was the basis for a favorable ruling for the plaintiffs.  *Id.* at 391-93.  The case does not stand for the proposition that the element of a *McDonnell Douglas* prima facie case is excused.  On the other hand, given that the evidence on whether Mrs. Winsett applied for a then available position is conflicting, Akata is not entitled to summary judgment on that ground.

---

[5] A prima facie case requires proof that a plaintiff applied for an "available" position.  If the employer is no longer seeking applicants for the position, a prima facie case cannot be made. *Tex. Dept. of Comm. Affairs*, 450 U.S. at 253; *see also, Van Slyke v. Northrop Grumman Corp.*, 115 F.Supp.2d 587, 594 (D.Md. 2000) ("In order to establish a prima facie case of failure to promote, [a plaintiff] must show . . . there was an open position for which she applied or sought to apply.").

**b. Qualifications**

Akata then asserts that Mrs. Winsett was not qualified for the Project Manager position because she "did not have the necessary experience to be promoted to Project Manager[.]" (ECF No. 57-1, at 21). Mrs. Winsett avers that she was qualified for the Project Manager position based on her assertion that she "had already performed the job for several years." (ECF No. 58-1, at 21).

The NRL Chesapeake contract requires the Project Manager to "have at least three years of experience in managing a workforce providing services on contracts of a similar size, scope and complexity." (ECF No. 57-5, at 125). Mrs. Winsett claims that she performed all of the duties of Project Manager despite holding the titles of General Clerk I and later, General Clerk II. Akata contends that Mrs. Winsett "did not have a project management or other certification that might qualify her for the role," but neither is a requirement for the Project Manager position. (ECF Nos. 57-1, at 20; 57-5, at 125). It cannot be said, as a matter of law, that Mrs. Winsett lacked the qualifications necessary, at minimum, to apply for the position. There is some evidence that, by the time of Mr. Duran's promotion, Mrs. Winsett had experience with the duties required by the NRL Chesapeake Project Manager. Mrs. Winsett had been employed by Akata for over three years, all of which was spent working on the NRL Chesapeake contract. Mrs.

17

Winsett's duties as General Clerk II required intimate knowledge of the NRL Chesapeake contract and the duties of the Project Manager. She was considered — but not selected — for the Project Manager position a few months later after Mr. Duran was terminated. Mrs. Winsett has provided sufficient evidence to suggest she may have met the basic experience qualifications required for the Project Manager position.

### c. Circumstances Giving Rise to an Inference of Discrimination

Mrs. Winsett's non-promotion gives rise to an inference of discrimination because Mr. Duran, a man, was given the job. *Carter v. Ball*, 33 F.3d 450, 458 (4th Cir. 1994).

### 2. Legitimate Non-discriminatory Reasons

Akata contends that the decision to select Mr. Duran was due to his qualifications. (ECF No. 57-1, at 19-22); *see also Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 259 (4th Cir. 2006) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("[R]elative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision.")). Akata continues to assert that Mrs. Winsett lacked the necessary qualifications, particularly the years of managerial experience. It contends that Mr. Duran had the experience and other qualifications to be considered, and that, compared to Mrs. Winsett, he was better qualified. Akata contends Mr. Duran was the most senior person at the Navy Yards and he

18

completed managerial tasks akin to those of a Project Manager. (ECF Nos. 57-3 ¶¶ 25-28; 57-6, at 34). Compared to Mrs. Winsett, whom Akata knew held the position of General Clerk II, which was not a managerial role, Akata believed that Mr. Duran held superior qualifications for the position. In support of this proposition, however, Akata only presents the vague conclusions of Dr. McMorris and Mr. Scott. As noted at the outset, Mr. Duran's application has not been provided, nor has Akata set forth reliable evidence of the process or criteria used to make the selection. It may have thought that Mr. Duran was the only internal candidate when the decision was made and there is no evidence that Mrs. Winsett's actual qualifications were compared to his. Thus, Akata has provided, at best, only weak evidence of its non-discriminatory reason, falling very close to no evidence at all.

### 3. Evidence of Pretext

If a sufficient showing has been made, the burden shifts back to Mrs. Winsett to prove Akata's offered reason is pretextual. The Fourth Circuit has noted:

> [u]nder the *McDonnell Douglas* framework, once an employer has met its burden of producing a legitimate nondiscriminatory explanation for its decision, the plaintiff is afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). That is, [the plaintiff] could

> attempt to establish that [she] was the victim
> of intentional discrimination by "showing that
> the employer's proffered explanation is
> unworthy of credence." *Id.* at 256.

*Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 646 (4th Cir. 2002). A plaintiff may establish the falsity of a proffered non-discriminatory reason by either "showing that [she] was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." *See Heiko*, 434 F.3d at 259.

Mrs. Winsett pursues both avenues in support of her claim. First, Mrs. Winsett argues that she was more qualified than Mr. Tyrell and Mr. Duran. Then, Mrs. Winsett argues that Akata's "pre-selection" of Mr. Duran and Akata's "constantly changing narrative" are evidence of pretext. (ECF No. 58-1, at 26-30).

### a. Relative Qualifications

Here, most problematically, the record is not only conflicting but woefully incomplete.

> Although a plaintiff may present an argument
> 'that [she] was the better candidate, courts
> are not to impose their own judgments for
> nondiscriminatory employer decisions. Absent
> a showing by plaintiff sufficient to raise an
> inference of pretext, [an employer] is free to
> [promote] an experienced . . . [individual]
> . . . instead of another employee with
> superior . . . qualifications.

*Obi v. Anne Arundel Cnty.*, 142 F.Supp.2d 655, 666 (D.Md. 2001) (quoting *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998)).

While neither party provided the job posting, there is no doubt the job required managerial experience. The Project Manager description under the NRL Chesapeake contract requires "at least three years of experience in managing a workforce providing services on contracts of similar size, scope, and complexity." (ECF No. 57-5, at 125). At bottom, the evidence is mixed and by no means as clear as Akata contends.

Mrs. Winsett argues that she was more qualified for the position than Mr. Duran. (ECF No. 58-1, at 24-26).[6] To demonstrate pretext Mrs. Winsett must show that her qualifications were "so *plainly superior* that the employer could not have preferred another candidate." *See Herring v. Thompson*, No. 01-3824-AMD, 2003 WL 23590541, *6 (D.Md. May 12, 2003) (quoting *Dennis*, 290 F.3d at 648, n.4). Akata says that it reasonably concluded that Mr. Duran was qualified based on his prior experience, but the evidence is scant, and Akata in fact never compared their qualifications at the time of the promotion decision. Mrs. Winsett offers deposition testimony of Akata employees suggesting that Mr. Duran's prior experience on the Navy Yards contract was not sufficient to meet the requirements for the NRL Chesapeake contract. (ECF No. 58-2, at 66-67, 107, 109). Thus, Mrs. Winsett has come forward with

_____

[6] Mrs. Winsett also challenges Mr. Tyrell's qualifications. (ECF No. 58-1, at 24). This challenge does not create an inference of discrimination because there was no vacant Project Manager position for which Mrs. Winsett could apply at that time.

evidence that the reason asserted for Mr. Duran's selection is not the real reason.  And, given the inadequate record of the selection process, with the uncertainty of who made the decision, it impossible to determine that it was not a pretext for sex discrimination.

### b. Circumstantial Evidence of Animus

Mrs. Winsett also argues that Akata's "pre-selection" of Mr. Duran and Akata's "constantly changing narrative" are circumstantial evidence of pretext. (ECF No. 58-1, at 26-30).

Mrs. Winsett offers a January 29, 2020 email from Akata's Chief Executive Officer and founder, Sonja Hines ("Ms. Hines") in which she explains that Mr. Ratliff was placed on administrative leave and that Mr. Duran would take over some of the Project Manager duties in the interim. (ECF No. 58-4, at 1).  Mr. Ratliff was not terminated until February 2020, however, and the Project Manager position did not become available until February 2020. Once the position was available, Mr. Duran had to apply just like any other applicant.  But Akata acknowledges that he was the only internal candidate at the time of his formal selection, and all agree that he was invited to apply while Mrs. Winsett, at best, was told she was welcome to apply. (ECF Nos. 57-6, at 21-23; 58-3, at 48-49).

Second, Mrs. Winsett argues that Akata's "constantly changing narrative is evidence of pretext." (ECF No. 58-1, at 27).  Mrs.

Winsett is correct in noting that "[c]ourts have found pretext where a defendant offers changing or inconsistent defenses." *Id.* In *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001), the Fourth Circuit found that the "different justifications at different times" for Sears' "failure to hire [plaintiff]" was probative of pretext. *Id.* at 582-83.

Mrs. Winsett argues that there are: (1) inconsistencies regarding whether Mrs. Winsett was solicited to apply for the Project Manager position; (2) inconsistencies regarding whether Mr. Ratliff performed Project Manager duties from home; (3) inconsistencies regarding whether Mr. Tyrell was appointed acting Project Manager; and (4) general contradictions from various Akata witnesses.  (ECF No. 58-1, 27-30).  To this list, Akata's inconsistent position on whether her application was timely, or considered, should be added.

All told, Mrs. Winsett has put forth sufficient evidence of pretext.  Accordingly, the motion for summary judgment will be denied as to Counts I and IV.

**B. Counts II and V: Sex Based Wage Discrimination**

In Counts II and V, Mrs. Winsett asserts that Akata violated Title VII, and the Maryland analogue, by "paying her substantially less than similarly situated male employees."  (ECF No. 1 ¶ 74). Akata argues that Mrs. Winsett cannot prove her sex-based wage discrimination claims because she was "fairly paid the wages" for

23

her positions at Akata.  (ECF No. 57-1, at 24).  Akata further argues that Mrs. Winsett has failed to "present any evidence that the tasks completed by her and a male comparator were equal, such that she was entitled to an increase in pay." (ECF No. 57-1, at 26).

A prima facie case under the *McDonnell Douglas* framework, requires a plaintiff to establish "(1) she is a member of a protected class, (2) she was performing her job satisfactorily, (3) an adverse employment action occurred, and (4) the circumstances suggest an unlawfully discriminatory motive." *Noonan v. Consol. Shoe Co., Inc.*, 84 F.4th 566, 573 (4th Cir. 2023) (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019)).  Being paid less for equivalent work can be an adverse employment action.  *See id.* at 572.

### 1. Undisputed Elements

It is undisputed that Mrs. Winsett, a woman, is a member of a protected class.  Akata has not raised a challenge regarding the sufficiency of Mrs. Winsett's work, and Mrs. Winsett adequately asserts lower compensation as an adverse employment action.  The only element of Mrs. Winsett's claim that Akata challenges appears to be whether Mrs. Winsett has presented evidence of circumstances suggesting an unlawfully discriminatory motive.

### 2. Unlawfully Discriminatory Motive

Akata asserts that Mrs. Winsett's reliance on two comparators, Mr. Ratliff and Mr. Duran, is improper. (ECF No. 57-1, at 26). In her opposition, Mrs. Winsett seemingly argues that Mr. Ratliff, Mr. Tyrell, and Mr. Duran are appropriate comparators as Mrs. Winsett performed "all of their [Project Manager] duties for them." (ECF No. 58-1, at 31). Mrs. Winsett further asserts that "comparators are not even required to establish pay discrimination." (*Id.*).

While correct in her assertion that comparators are not required to establish a prima facie case of wage discrimination, Mrs. Winsett does not "present evidence that reasonably creates an inference an unlawfully discriminatory motive." *See Noonan*, 84 F.4th at 573. Mrs. Winsett asserts she was paid less than Mr. Ratliff, Mr. Tyrell, and Mr. Duran for performing "greater" work than each of them and therefore it appears Mrs. Winsett is relying on each individual as a comparator for her claim. (ECF No. 58-1, at 30-31).

"Where . . . the prima facie case of wage discrimination is based on comparators, the plaintiff must show that she is paid less than men in similar jobs." *Spencer*, 919 F.3d at 207. In assessing the similarity requirement of Title VII, the Fourth Circuit has reminded us that "the plaintiff must provide evidence that the proposed comparators are not just similar in *some*

25

respects, but 'similarly-situated *in all respects*.'"  *Id.* at 207 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

To determine whether two jobs are "similar" under Title VII, courts consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision."  *Id.* at 207 (quoting *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (internal quotation marks omitted)).

In her opposition, Mrs. Winsett identifies three male comparators to whom she believes her work was at least equal—Mr. Ratliff, Mr. Duran, and Mr. Tyrell.  (ECF No. 58-1, at 31).  None, however, were performing a substantially similar job.

Mr. Ratliff was the Project Manager and Mrs. Winsett's immediate supervisor until he was placed on administrative leave on January 27, 2020.  Mrs. Winsett contends that Mr. Ratliff was out for extended periods of time for various medical procedures and that, during that time, Mrs. Winsett performed the duties of the Project Manager.  (ECF No. 58-2, at 10-11).  Even when Mr. Ratliff was not out on medical leave, Mrs. Winsett states she did the work of the Project Manager.  (*Id.* at 12-13).  Mrs. Winsett's claim that she was unfairly paid in comparison to Mr. Ratliff is

26

founded on the contention that, in Mr. Ratliff's absence, Mrs. Winsett believes she "performed the duties of [Project Manager]." (ECF No. 58-1, at 5). She acknowledged, however, that she had no authority to hire and fire, discipline, or perform employee evaluations. (ECF No. 57-5, at 34-35). She was not subject to the same standards, did not have the same supervisor, or comparable experience, education, and other qualifications as Mr. Ratliff and therefore, Mr. Ratliff is not an appropriate comparator for Mrs. Winsett's claims.

Similarly, Mrs. Winsett provides no evidence that she was subject to the same standards, had the same supervisor, or had comparable experience, education, and other qualifications as Mr. Duran or Mr. Tyrell. Mr. Tyrell served as an interim Project Manager, meeting the NRL Chesapeake's onsite requirement, during Mr. Ratliff's investigation. (ECF Nos. 57-4, at 32; 57-5, at 27). During that time, Mr. Tyrell was Mrs. Winsett's supervisor. (ECF No. 57-5, at 27). Mrs. Winsett may have assisted Mr. Tyrell on various projects, but she was still acting in her role as General Clerk II. Further, the interim position held by Mr. Tyrell was not a promotion to the position of Project Manager. It was a temporary role designed to fulfill the NRL Chesapeake's onsite requirement. In deciding to appoint Mr. Tyrell to this temporary role, Akata relied on Mr. Tyrell's trade skills background which was similar to that of Mr. Ratliff. (ECF No. 58-2, at 58).

27

Finally, Mrs. Winsett has not provided any evidence that she and Mr. Duran performed substantially equal jobs. While Mr. Duran held the Project Manager position, Mrs. Winsett was a General Clerk II. Despite Mrs. Winsett's assertion that she performed Mr. Duran's work for him, this does not change the fact that Mrs. Winsett did not hold the position of Project Manager. Again, she may well have helped this small team perform its functions, sometimes performing tasks or portions of tasks of the Project Manager, but the evidence does not show that there were two people in the Project Manager role at the same time.

Mrs. Winsett's assertions that she completed the work of her alleged comparators does not show that her work and those of any of her three comparators was sufficiently similar to meet her burden under Title VII. Similarly, Mrs. Winsett's generalizations do not create an inference of any discriminatory motive. While Mrs. Winsett may have communicated directly with Navy personnel and was seen as the point of contact, she was "appointed" to this position by Mr. Ratliff, the Project Manager. (ECF No. 57-5, at 20). Mrs. Winsett avers she drafted proposals in their entirety, a Project Manager duty, but she could not send them off without the approval of her supervisor, the Project Manager. (ECF Nos. 58-2, at 151-65; 58-3, at 1-23). Despite the substantive work Mrs. Winsett did in her time at Akata, at no point did she hold the position of her comparators—Project Manager. Accordingly, Mrs.

Winsett has not met her burden, and Akata's motion for summary judgment will be granted as to Counts II and V.

### C.   Counts III and VI: Retaliation

In Counts III and VI, Mrs. Winsett alleges that she was retaliated against for: (1) telling Dr. McMorris in 2019 that Mr. Ratliff refused to promote her because she was a woman; and (2) submitting written complaints of Mr. Ratliff's sexist and discriminatory behavior to Human Resources in 2020.   Akata argues that there are no disputed facts or evidence supporting Mrs. Winsett's retaliation claim and challenges Mrs. Winsett's ability to show a causal connection between her "alleged protected activity and the alleged adverse employment action."   (ECF No. 57-1, at 27-30).

#### 1. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must prove "(i) that she engaged in protected activity, (ii) that her employer took adverse action against her, and (iii) that a causal relationship existed between the protected activity and the adverse employment activity." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 653 (4th Cir. 2021).

It is undisputed that Mrs. Winsett's reporting of Mr. Ratliff's discriminatory statements and Mrs. Winsett's participation in the investigation into Mr. Ratliff are protected activities.   *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d.

253, 259 (4th Cir. 1998) ("An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace."). Nor is it disputed that Mrs. Winsett's alleged loss of promotional opportunity constitutes an adverse action. *See Jennings*, 679 F.Supp.3d at 281 (quoting *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) ("'[D]ischarge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion' constitute adverse actions.")). The only dispute is whether Mrs. Winsett has established causation.

> To establish causation, the third element, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013); *see Irani*, 767 F.App'x at 421. At trial, the plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015). This requirement is also described as "but-for" causation.
>
> . . .
>
> "'A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes.'" *Id.* at 123 (quoting *Johnson v. United Parcel Service,*

> *Inc.*, 839 F.App'x 781, 783–84 (4th Cir. 2021));
> *see Laurent-Workman v. Wormuth*, 54 F.4th 201,
> 218–19 (4th Cir. 2022); *Smith v. CSRA*, 12 F.4th
> 396, 417 (4th Cir. 2021).  "A plaintiff may
> establish the existence of facts that
> 'suggest[ ] that the adverse action occurred
> because of the protected activity.'" *Roberts*,
> 998 F.3d at 123 (quoting *Johnson*, 839 F.App'x
> at 783–84); *see Wormuth*, 54 F.4th at 218–19.
> Or, a plaintiff may demonstrate that "'the
> adverse act bears sufficient temporal
> proximity to the protected activity[.]'"
> *Wormuth*, 54 F.4th at 218 (quoting *CSRA, Inc.*,
> 12 F.4th at 417); *Johnson*, 839 F.App'x at 784
> (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532
> U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d
> 509 (2001)).

*Jennings*, 679 F.Supp.3d at 281.  "An employee may establish prima facie causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity."  *Id.* at 282 (quoting *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 335–36 (4th Cir. 2018)).  Mrs. Winsett has sufficiently established temporal proximity, because the record reflects that she was denied the promotion roughly a month after providing her written complaint about Mr. Ratliff to Akata.

### 2. Legitimate Non-Discriminatory Reason

As discussed above, Akata has not completely rebutted the inference of discrimination by providing evidence that Mrs. Winsett was not selected for the position over Mr. Duran due to Mr. Duran's superior qualifications.

31

**3. Evidence of Pretext**

As discussed at length above, Mrs. Winsett has provided evidence demonstrating that Akata's offered reason for its promotion decision was pretextual. Taking the evidence in the light most favorable to Mrs. Winsett, given the very close proximity to her participation in the investigation of Mr. Ratliff in which she complained of sex discrimination, it could be a pretext for retaliation. Accordingly, Akata's motion for summary judgment will be denied as to Counts III and VI.

**IV. Conclusion**

For the foregoing reasons, Akata's motion for summary judgment will be granted in part and denied in part, and Mrs. Winsett's motion for leave to file a surreply will be denied. A separate order will follow.

/s/
_____
DEBORAH K. CHASANOW
United States District Judge